**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

| | | |
|---|---|---|
| THOMAS T. LONERGAN and CYNTHIA M. LONERGAN, | ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | No. 2:12-CV-04226-NKL |
| v. | ) ) | |
| BANK OF AMERICA, N.A., et al., | ) ) | |
| Defendants. | ) | |

**ORDER**

Defendant Bank of America, N.A. ("the Bank"), for itself individually and as successor by merger to Countrywide Bank, FSB ("Countrywide"), moves to dismiss the Amended Complaint of Plaintiffs Thomas and Cynthia Lonergan for failure to state a claim [Docs. ## 4, 38]. For the reasons set forth below, the Bank's motion to dismiss is DENIED.

**I.      Background and Factual Allegations**

In the spring of 2007, the Lonergans engaged Jason Thomas, then a mortgage broker for First Ohio Banc and Lending, Inc. ("First Ohio"), in order to refinance two mortgages on their home. On April 30, 2007, the Lonergans closed on a refinancing deal with Countrywide, for which First Ohio received a commission. At the closing, the Lonergans signed two promissory notes in favor of Countrywide in the amounts of $2,000,000 and $246,000, respectively. The notes were secured by two deeds of trust.

1

The first note had a fixed interest rate of 7.75 percent for the first sixty months. After sixty months, on May 1, 2012, the interest rate would change to an adjustable interest rate. This date, and any subsequent date on which the adjustable interest rate could change, was referred to as the Interest Rate Change Date. The note required monthly payments of $8,164.82 until the first Interest Rate Change Date.

The Lonergans allege that the terms of this note were concealed from them at the closing and differed significantly from what was previously promised to them. According to the Lonergans, Thomas repeatedly told them during discussions leading up to the closing that their approximate monthly payment for the first mortgage would be $4,6000.00 for the first sixty months. In addition, First Ohio sent the Lonergans a "Good Faith Estimate" dated February 24, 2007, which indicated that the monthly payment would be $4,166.67 for the first sixty months. This was less than the monthly payment the Lonergans were required to make under their original mortgage and the sole reason the Lonergans entered into the refinancing arrangement.

On the morning of the closing, the Lonergans spoke with Thomas on the phone and Thomas told them that he had reviewed the closing documents and everything was in order. Thomas informed them that the amount of the monthly payment would be $4,583.00 for the first sixty months. That afternoon, a settlement agent from American Title Solutions went to the Lonergans' home to complete the closing. The agent was very late and told the Lonergans that she had another closing to complete after finishing with them. The documents for both the first and second mortgages had to be signed.

2

As a result, the papers were signed as expeditiously as possible and the agent did not review the terms of the closing documents with the Lonergans at the signing. The Lonergans, relying on the representations Thomas made to them earlier that day, believed the documents conformed to the prior promises made during the refinancing process. The Lonergans were not able to review the documents at the closing and consequently did not see that the note they signed required monthly payments of $8,164.82 for the first sixty months. In addition, the Lonergans did not see the references to the Maximum Principal Balance, also referred to as the Maximum Negative Amortization Cap, which had never before been mentioned.

The Lonergans did not become aware of the higher monthly payment until they received their first billing statement from Countrywide, on or about May 25, 2007. The Lonergans contacted Thomas to address the issue and Thomas told them that Countrywide had misled First Ohio into believing that the minimum payment would be lower. Thomas also told the Lonergans that Countrywide said nothing could be done about the much larger minimum payment because the papers were all signed. Over the next several months, the Lonergans tried to raise the issue with Countrywide, but Countrywide did not respond to their complaints. Ultimately, the Lonergans resigned themselves to making the larger payment.

The Lonergans did not become aware of the significance of the Maximum Negative Amortization Cap until several years later. In June 2011, the Lonergans received notice that the servicing of their home loan was going to transfer to the Bank on July 1, 2011. In August 2011, the Lonergans received a notice from the Bank indicating

3

that their monthly payment was going to increase to $14,848.87 on November 1, 2011. This surprised the Lonergans, as the promissory note provided that their monthly payment would be $8,164.82 until May 1, 2012, the first Interest Rate Change Date, with the first adjusted payment accordingly due on June 1, 2012. The Lonergans called the Bank at the number provided in the notice and were told to disregard the notice and continue making monthly payments of $8,164.82. The Lonergans subsequently received multiple statements from the Bank that listed varying amounts due on November 1, 2011. The Lonergans called the Bank for clarification, and they were again told that a different payment was not due until June 1, 2012, and to continue making monthly payments of $8,164.82.

On December 24, 2011, the Lonergans received a Notice of Intent to Accelerate, which indicated that their loan was in serious default and could only be cured if the Lonergans remitted $22,167.27 on or before January 18, 2012. A closer review of the closing documents revealed a reference to the Maximum Principal Balance, which was 115 percent of the amount of the mortgage, or $2,300,000. Under the terms of the note, if at any point during repayment the unpaid principal reached this amount, the monthly payment would be adjusted to the amount necessary to pay the interest portion of their loan payment. This explained the unexpected increase in payment. With an interest rate of 7.75 percent and a monthly payment of $8,164.82, the balance on the loan would necessarily reach the Maximum Principal Balance prior to the expiration of the sixty month fixed-rate period.

4

Based on the foregoing, the Lonergans claim that they were the victims of a "bait and switch" conspiracy. In particular, the Lonergans allege that the actual amount of the monthly payment was concealed from them at the closing in order to induce them to sign the note under the belief that its terms were in accord with the prior, fraudulent representations made by Countrywide and First Ohio. In addition, the Lonergans claim that the confusing and inconsistent language in the promissory note and the Defendants' collective silence regarding the Maximum Principal Balance fraudulently led them to believe that their monthly payment would not change for the first sixty-months.

On May 17, 2012, the Lonergans filed a *pro se* Complaint, which initially contained seven counts: (1) breach of the implied covenant of good faith and fair dealing; (2) breach of contract; (3) unjust enrichment; (4) fraud/misrepresentation; (5) negligence; (6) aiding and abetting; and (7) conspiracy. After the Bank's motion to dismiss was fully briefed, the Lonergans moved to file an Amended Complaint [Doc. # 32], and the Court granted the request [Doc. # 33]. The Amended Complaint adds a claim under the Missouri Merchandising Practices Act ("MMPA"), but is otherwise identical to the Lonergans' initial Complaint. *Compare* [Doc. # 1-1], *with* [Doc. # 35].

On December 11, 2012, the Bank moved to dismiss the Amended Complaint in its entirety. [Doc. # 38]. The Bank incorporated the arguments from its first motion to dismiss and added argument regarding the newly added eighth count of the Amended Complaint. Because this argument is substantively identical to the arguments advanced in the Bank's first motion to dismiss, as made clear in the discussion that follows, both motions are fit for resolution in this Order.

5

## II. Discussion

Pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(6), the Bank moves to dismiss the Lonergans' Amended Complaint for failure to state a claim. Under FRCP 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The complaint does not have to present "detailed factual allegations," but it "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When considering a motion to dismiss, the Court must accept as true the factual allegations contained in the complaint, and draw all reasonable inferences from those allegations in favor of the plaintiff. *See Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 660 (8th Cir. 2012). In addition, a *pro se* complaint must be liberally construed, *Smith v. St. Bernards Reg'l Med. Ctr.*, 19 F.3d 1254, 1255 (8th Cir. 1994), and is held to a less stringent standard than one drafted by an attorney, *Walker v. Reed*, 104 F.3d 156, 157 (8th Cir. 1997).

### A. The Statute of Limitations

The Bank argues that the statute of limitations bars Counts One, Two, Four, Seven, and Eight[1] of the Lonergans' Amended Complaint. When the affirmative defense of the statute of limitations is asserted in a motion to dismiss, the complaint "may not be

---

[1] The substantive claims are: (1) breach of the implied covenant of good faith and fair dealing; (2) breach of contract; (4) fraud/misrepresentation; (7) conspiracy; and (8) violation of the MMPA.

6

dismissed unless it clearly establishes 'on its face and without exception' that it is barred." *Kixmiller v. Bd. of Curators of Lincoln Univ.*, 341 S.W.3d 711, 714 (Mo. Ct. App. 2011) (quoting *Sheehan v. Sheehan*, 901 S.W.2d 57, 59 (Mo. 1995) (en banc)). The Bank contends that the claims in these five counts are all subject to a five-year statute of limitations, which began to run on April 30, 2007, the date the Lonergans signed their promissory note. Since the Lonergans did not file their Complaint until May 17, 2012, the Bank maintains that these claims are barred by the statute of limitations. The Lonergans respond that their claims in Counts One and Two, breach of the implied covenant of good faith and fair dealing and breach of contract, are governed by a ten-year statute of limitations. Alternatively, and with respect to the other three claims,[2] the Lonergans argue that the statute of limitations did not begin to run, at the earliest, until they received their first loan statement, on or about May 25, 2007.

### 1.    Which Statute of Limitations Applies

Missouri law provides, in relevant part, that a five-year statute of limitations applies to "[a]ll actions upon contracts, obligations or liabilities, express or implied, except those mentioned in section 516.110, . . . ." Mo. Rev. Stat. § 516.120(1). Section 516.110(1) establishes a ten-year statute of limitations for "[a]n action upon any writing, whether sealed or unsealed, for the payment of money or property." This includes promissory notes. *Sabine v. Leonard*, 322 S.W.2d 831, 837 (Mo. 1959) (en banc). In interpreting § 516.110(1), the Missouri Supreme Court concluded:

---

[2] The Lonergans do not, and cannot, dispute that the five-year statute of limitations applies to their claims of fraud/misrepresentation, conspiracy, and violation of the MMPA. *See* Mo. Rev. Stat. § 516.120.

7

> Taken at its plain meaning, section 516.110(1), the ten-year statute of limitations applies to every breach of contract action in which *the plaintiff seeks a judgment from the defendant for payment of money the defendant agreed to pay in a written contract.* . . . This is the application of section 516.010(1) [*sic*], admittedly quite broad, that we adopt.

*Hughes Dev. Co. v. Omega Realty Co.*, 951 S.W.2d 615, 617 (Mo. 1997) (en banc) (emphasis added). Accordingly, § 516.110(1) "applies only in instances in which an express written obligation provides for the payment of money or the delivery of property *and that the money or property sued for is that money or property promised by the language of the writing*." *Lackawanna Chapter of Ry. & Locomotive Historical Soc'y, Inc. v. St. Louis Cnty., Mo.*, 606 F.3d 886, 890 (8th Cir. 2010) (emphasis added) (quoting *Lato v. Concord Homes, Inc.*, 659 S.W. 2d 593, 594 (Mo. Ct. App. 1983)); *see also Superintendent of Ins. of State of N.Y. v. Livestock Mkt. Ins. Agency, Inc.*, 709 S.W.2d 897, 901-02 (Mo. Ct. App. 1986) ("[T]o constitute *a promise for the payment of money,* 'the money sued for' must be that money promised by the language of the writing . . . .").

The Lonergans cannot and do not seek a judgment for payment of money the Bank agreed to pay in a written contract, because the Bank never agreed to pay the Lonergans money in a written contract. Citing *Sabine*, the Lonergans suggest that a promissory note is a written contract for the payment of money and thus any and all claims related to a promissory note fall within § 516.110(1). But this reading of § 516.110(1) is contrary to the interpretation of this statute adopted in *Hughes*. *See Hughes*, 951 S.W.2d at 617. Furthermore, *Sabine* held only that the ten-year statute of limitations applied where the plaintiff was suing for payments the defendant allegedly owed under a promissory note. *See Sabine*, 322 S.W.2d at 832, 837. This is consistent with the rule, as stated above, that

8

the ten-year statute of limitations applies when there is an express written agreement providing for the payment of money and the plaintiff is suing for the very payments required by the language of that agreement. The Lonergans seek damages resulting from the execution of their promissory note and modification of the terms of that note, but they do not seek a payment the Bank was required to make under the note. Consequently, the five-year statute of limitations applies.

### 2.      When the Statute of Limitations Began to Run

Generally, an action accrues, and thus the statute of limitations begins to run:

> [N]ot . . . when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment, and, if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained.

Mo. Rev. Stat. § 516.100. "Damage is ascertainable when the fact of damage can be discovered or made known, not when a plaintiff actually discovers injury or wrongful conduct." *Sheehan v. Sheehan*, 901 S.W.2d 57, 58-59 (Mo. 1995) (en banc) (quotation omitted). This is an objective test, which depends on whether "*the evidence was such to place a reasonably prudent person on notice of a potentially actionable injury.*" *Powel v. Chaminade Coll. Preparatory, Inc.*, 197 S.W.3d 576, 582 (Mo. 2006) (en banc) (quotation omitted); *see also Ball v. Friese Const. Co.*, 348 S.W.3d 172, 177 (Mo. Ct. App. 2011) ("The test to be applied is when a reasonable person would have been put on notice that an injury and substantial damages may have occurred and would have undertaken to ascertain the extent of the damages." (quotation omitted)).

9

An action premised on fraud accrues when the injured party discovers the facts constituting the fraud. Mo. Rev. Stat. § 516.120(5). Discovery, as used in this section, is defined to include actual or constructive knowledge of the fraud. *Gilmore v. Chicago Title Ins. Co.*, 926 S.W.2d 695, 698 (Mo. Ct. App. 1996). Thus, the statute of limitations begins to run when the plaintiff "discovered or in the exercise of due diligence, should have discovered the fraud." *Id.* (quotation omitted). Put differently, "[t]he cause of action accrues when a plaintiff has sufficient facts to inform a reasonable person that a fraud has been committed." *Misischia v. St. John's Mercy Med. Ctr.*, 30 S.W.3d 848, 867 (Mo. Ct. App. 2000).

All of the claims the Bank argues are barred by the statute of limitations are premised on the allegation that the terms of the closing documents differed from what the Lonergans were previously promised. The Bank contends that the statute of limitations began to run for these claims on the date the Lonergans signed the closing documents, April 30, 2007. Since parties are presumed to read the documents they sign, *Warren v. Paragon Techs. Grp., Inc.*, 950 S.W.2d 844, 846 (Mo. 1997) (en banc), the Bank maintains that the Lonergans had constructive knowledge of any problems related to the terms of the promissory note as of the date of the closing.

But this presumption only applies in the absence of fraud. *See, e.g.*, *Horseshoe Entm't, L.P. v. Gen. Elec. Capital Corp.*, 990 F. Supp. 737, 742 (E.D. Mo. 1997); *Farmland Indus., Inc. v. Bittner*, 920 S.W.2d 581, 584 (Mo. Ct. App. 1996). Thus, for the purpose of tolling the statute of limitations, parties are not charged with knowledge of the contents of a contract they signed when they allege that the relevant terms of that

10

contract were concealed from them. *Cmty. Title Co. v. U.S. Title Guar. Co., Inc.*, 965 S.W.2d 245, 254 (Mo. Ct. App. 1998). The Lonergans claim that the terms of the closing documents were concealed from them through the rushed closing and the closing agent's decision not to review the closing documents with them. [Doc. # 35 at 8-9]. The Bank responds that this allegation is implausible because the Lonergans "are not typical home loan borrowers." As the Lonergans portray themselves as sophisticated businesspersons experienced in real estate transactions, *see* [Doc. #35 at 6], the Bank maintains that the Lonergans should have known how important it was to carefully review the closing documents. But this argument goes only to the credibility of the Lonergans' allegations.

At this stage, the Court must give the *pro se* portion of the Lonergans' Amended Complaint a liberal construction, accept as true the factual allegations contained therein, and draw all reasonable inferences in favor of the Lonergans. In light of these conditions, it does not appear from the face of the Amended Complaint that the statute of limitations began to run, without exception, on the date of the closing. The Lonergans allege that the closing agent concealed the terms of the closing documents from them at the closing. While the fact of concealment remains to be proven, it is not certain from the face of the Amended Complaint that the closing agent did not prevent the Lonergans from reviewing these documents. Consequently, dismissal on the basis of the statute of limitations is not appropriate at this stage. *See Cmty. Title Co.*, 965 S.W.2d at 255 ("[T]here may be facts which establish that U.S. Title's claims are barred by the statute of limitations, but these facts are not borne out by the face of the counterclaim and third party petition. If such

11

facts should be developed, the limitations defense may be raised at trial or by a motion for summary judgment.").

Furthermore, other allegations in the Amended Complaint suggest that even if the Lonergans were presumed to have read the closing documents on the date of the closing, the full extent of the alleged damage would not have been ascertainable on that date. While the minimum monthly payment was clearly ascertainable from the promissory note, the significance of the Maximum Negative Amortization Cap was not. In one section, the note stated that the minimum monthly payment would be calculated in three ways. [Doc. # 5-1 at 2]. The second of these three methods provided that if the principal balance reached the Maximum Negative Amortization Cap, the minimum payment would be adjusted to an amount sufficient to pay the interest portion of the monthly payment. [Doc. # 5-1 at 2]. The Maximum Negative Amortization Cap was elsewhere defined as 115 percent of the original principal. [Doc. # 5-1 at 1]. Immediately after the section describing how the minimum payment would be calculated, a section titled "Initial Monthly Minimum Payment" provided, "Each of my initial monthly Minimum Payments until the first Interest Rate Change Date will be in the amount of U.S. $8,164.82." [Doc. # 5-1 at 2]. This section did not include any qualifying language suggesting that this seemingly fixed payment might change before May 1, 2012, the first Interest Rate Change Date. [Doc. # 5-1 at 1].

But the minimum monthly payment was necessarily going to go up prior to the expiration of the sixty-month fixed-rate period because under the terms of the note the principal was bound to reach the Maximum Negative Amortization Cap in a shorter time.

12

For this to be ascertainable at the closing, the Lonergans would have had to do the math themselves. They would have needed to calculate the amount of unpaid interest that would be added to the principal balance based on the interest rate and minimum monthly payment set out in the note. Then, seeing that this would reach 115 percent of the original principal in less than sixty months, they could have calculated when the fixed payment period was actually going to expire and what their new payment would be at that time. But "a party to contractual negotiations is entitled to rely on a positive representation of fact by the other party." *Misischia*, 30 S.W.3d at 867. The Lonergans claim that First Ohio and the Bank never mentioned the Maximum Negative Amortization Cap, or Maximum Principal Balance, and repeatedly promised that the monthly payment would be fixed for the first sixty months. [Doc. # 35 at 8, 16-17, 24].

As such, the Lonergans would have had to have the presence of mind to disregard these representations as well as the unqualified language elsewhere in the note that seemingly fixed the minimum monthly payment at $8,164.82 for the first sixty months, and then perform the above calculations *sua sponte*. This exceeds what is expected from the reasonably prudent mortgagee. In fact, according to the Lonergans, the Bank's own employees did not understand the effect of the Maximum Negative Amortization Cap. Even after this provision took effect, the Bank's representatives repeatedly instructed the Lonergans to continue making a monthly payment of $8,164.82, in accord with the clear language of the promissory note. [Doc. # 35 at 12-13].

Damage is ascertainable when "the evidence was such to place a reasonably prudent person on notice of a potentially actionable injury," *Powel*, 197 S.W.3d at 582,

13

and fraud is discoverable "when a plaintiff has sufficient facts to inform a reasonable person that a fraud has been committed," *Misischia*, 30 S.W.3d at 867. The Lonergans allege that they were promised a fixed monthly payment for the first sixty months and a reasonably prudent person in their position would not have realized on the date of the closing that they were actually agreeing to a shorter period. The full extent of the alleged damage and fraud was thus not ascertainable on this date and the statute of limitations did not begin to run at this time. *See* Mo. Rev. Stat. § 516.100 (providing that an action accrues "when the damage resulting therefrom is sustained and is capable of ascertainment, and, if more than one item of damage, then the last item"). Consequently, the Bank has not shown that Counts One, Two, Four, Seven, and Eight are untimely.

## B.    Unjust Enrichment

The Bank argues that the Lonergans' Amended Complaint fails to allege the required elements of an unjust enrichment claim. "The elements of unjust enrichment are: a benefit conferred by a plaintiff on a defendant; the defendant's appreciation of the fact of the benefit; and the acceptance and retention of the benefit by the defendant in circumstances that would render that retention inequitable." *Bauer Dev. LLC v. BOK Fin. Corp.*, 290 S.W.3d 96, 100 (Mo. Ct. App. 2009) (quotation omitted). "As an equitable remedy, unjust enrichment is also discretionary and highly factual." *Asbury Carbons, Inc. v. Sw. Bank*, No. 4:10-CV-878 (CEJ), 2011 WL 1086067, at *4 (E.D. Mo. Mar. 22, 2011). Regarding the third element in particular, the Court must "consider whether any wrongful conduct by the defendant contributed to the plaintiff's disadvantage." *S & J, Inc. v. McLoud & Co., LLC*, 108 S.W.3d 765, 768 (Mo. Ct. App.

14

2003). This element requires "something more than passive acquiescence, such as fault or undue advantage on the part of the defendant." *Id.*

The Lonergans maintain that, given the fraud at the closing, it was inequitable for the Bank to retain the difference between the monthly payment the Lonergans were promised and the monthly payment required by the promissory note. The Bank responds that this cannot be inequitable, and therefore the Lonergans have not pleaded the third element of unjust enrichment, because the Lonergans were contractually obligated to make these payments. The Bank's argument thus presumes that no fraud was committed at the closing. But the Lonergans allege that: they were repeatedly promised a significantly lower monthly payment; they were told on the day of the closing that the closing documents contained the lower payment; the closing agent concealed the actual monthly payment; these acts were done intentionally, in order to deceive the Lonergans into signing a document that contained less favorable terms than they were promised; and the Bank later ignored the Lonergans' repeated complaints about this discrepancy. These allegations set forth sufficient wrongful conduct on the part of the Bank to satisfy the third element of an unjust enrichment claim and dismissal of this claim is not warranted.

### C.    Negligence

#### 1.    Whether a Lender Owes a Duty to a Borrower

The Bank argues that the Lonergans' negligence claim fails as a matter of law because a lender owes no duty to a borrower.[3] A series of recent decisions in the Western

---

[3] "To state a claim for negligence, a plaintiff must plead facts that support each of the following elements: (1) the defendant had a duty to protect the plaintiff from injury; (2) the defendant

15

and Eastern Districts of Missouri have held that, under Missouri law, a lender does not owe a duty to a borrower. *See, e.g.*, *Pace v. Wells Fargo Bank, N.A.*, No. 4:11-CV-489 CAS, 2012 WL 3705088, at *15 (E.D. Mo. Aug. 27, 2012) ("Under Missouri law, however, the relationship between a lender and a borrower is one of contractual obligation, not of duty." (citing *Wood & Huston Bank v. Malan*, 815 S.W.2d 454, 458 (Mo. Ct. App. 1991))); *Sultan v. BAC Home Loans Servicing L.P.*, No. 2:10-CV-04271-NKL, 2011 WL 1557933, at *3 (W.D. Mo. Apr. 25, 2011) ("Missouri law provides that a lender owes no duty to a borrower." (citing *UT Commc'ns Credit Corp. v. Resort Dev., Inc.*, 861 S.W.2d 699, 710 (Mo. Ct. App. 1993))); *White v. BAC Home Loans Servicing, L.P.*, No. 4:10-CV-2137 CAS, 2011 WL 1483919, at *11 (Apr. 19, 2011) ("Under Missouri law, the relationship between a lender and a borrower is one of contractual obligation, not one of duty." (citing *Wood & Huston Bank*, 815 S.W.2d at 458)).

The Lonergans contend, however, that the Missouri cases cited in these decisions do not support such a broad holding and that no such bright-line rule actually exists in Missouri. The two Missouri cases cited in the above district court decisions each concerned claims of breach of a fiduciary duty. *See UT Commc'ns Credit Corp.*, 861 S.W.2d at 709-10; *Wood & Huston Bank*, 815 S.W.2d at 458. In *UT Communications*, the court held that "absent other evidence of a fiduciary relationship, there is no such relationship between a bank as lender and its customer as borrower." *UT Commc'ns Credit Corp.*, 861 S.W.2d at 710. Because the claimant-borrowers failed to prove the

_____

breached that duty; and (3) the breach was the proximate cause of the plaintiff's injury." *Whipple v. Allen*, 324 S.W.3d 447, 451 (Mo. Ct. App. 2010).

existence of a fiduciary duty, the court found in favor of the mortgagor on the claim of breach of fiduciary duty. *Id.* Similarly, the *Wood & Huston* court held, "Generally, the relationship between a bank and its depositor involves a contractual relationship between a debtor and a creditor." *Wood & Huston Bank*, 861 S.W.2d at 458. Because the claimant-depositors "failed to show the existence of a fiduciary relationship," the court found in favor of the bank on the claim of breach of fiduciary duty. *Id.*

The Lonergans maintain that it is not appropriate to extrapolate from these decisions an absolute rule that a lender never owes a duty to a borrower. In support, the Lonergans cite the Missouri Court of Appeals' holding in *Business Men's Assurance Co. of America v. Graham*, 891 S.W.2d 438 (Mo. Ct. App. 1994):

> In Missouri, a mere breach of contract does not provide a basis for tort liability, but the negligent act or omission which breaches the contract may serve as the basis for an action in tort. If the duty arises solely from the contract, the action is contractual. The action may be in tort, however, *if the party sues for breach of a duty recognized by the law as arising from the relationship or status the parties have created by their agreement.*

*Bus. Men's Assurance Co. of Am.*, 891 S.W.2d at 453 (emphasis added) (citations omitted); *see also Autry Morlan Chevrolet Cadillac, Inc. v. RJF Agencies, Inc.*, 332 S.W.3d 184, 193 (Mo. Ct. App. 2010) (" 'The courts of our state have never recognized the mere breach of a contract as providing a basis for tort liability. In contract, however, the complained of act or omission which breaches a contract may also be a negligent act which would give rise to a liability in tort. In this latter instance, it is the act and not the breach of the contract which serves as the basis for the tort claim.' " (quoting *Am. Mortg. Inv. Co. v. Hardin-Stockton Corp.*, 671 S.W.2d 283, 293 (Mo. Ct. App. 1984))). To

17

determine whether an action lies in contract or tort, the Court must first ascertain the origin of the alleged duty. *See First S. Ins. Co. v. Jim Lynch Enters., Inc.*, 932 F.2d 717, 719-20 (8th Cir. 1991).

> [I]f the duty claimed is one arising solely from or imposed only by the contract, then the action lies in contract. On the other hand, if a party sues for breach of duty prescribed by law as an incident of the relation or status which the parties have created by their agreement, the action may be one in tort, . . . .

*Id.* (quoting *Am. Mortg. Inv. Co.*, 671 S.W.2d at 293)).

The deficiency in the Lonergans' position is that they have not alleged that the Bank, as lender, breached any duty recognized by Missouri law that arises from the borrower-lender relationship created by the execution of a mortgage contract. The Lonergans claim that the Bank was negligent for: failing to make sure that the closing agent reviewed the terms of the closing documents herself and with the Lonergans; allowing the mortgage broker to make material misrepresentations to the Lonergans; and failing to correct the amount of the initial minimum monthly payment required by the promissory note. But the Lonergans have not cited any Missouri statute or case suggesting that a lender, as an incident of the relationship created by the execution of a mortgage contract, has a duty to avoid these omissions. Rather, it appears that if the Bank had any duty at all in these circumstances, it arose entirely from the fraud prevention clauses contained in the closing documents. Consequently, "the duty claimed is one arising solely from or imposed only by the contract," and the Lonergans' negligence claim fails because it does not allege that the Bank, as lender, owed them a legally recognized duty. *See First S. Ins. Co.*, 932 F.2d at 719-20.

## 2. Whether a Loan Servicer Owes a Duty to a Borrower

The Lonergans alternatively argue that the Bank, as loan servicer, had a legally recognized duty to disclose accurate information regarding the Loergans' repayment of their loan. The Bank does not respond to this claim, other than to point out that the Lonergans describe the Bank as a lender in their Amended Complaint. But the Lonergans' Amended Complaint describes the Bank as both a lender [Doc. # 35 at 6] and a loan servicer [Doc. # 35 at 12] ("In June 2011, the Lonergans received a notice from Bank of America Home Loans 'that effective July 1, 2011, the servicing of home loans by our subsidiary . . . will transfer to our parent company – Bank of America, N.A.'"). As loan servicer, the Lonergans maintain that the Bank negligently provided inconsistent and inaccurate information when the Lonergans called about the notice that their monthly payment was going to increase on November 11, 2011. According to the Lonergans, the number they called was listed in the Bank's notice regarding the increase in payment, which instructed the Lonergans to call that number if they were concerned about the new monthly payment. [Doc. # 35 at 12].

Under these circumstances, the notion that a bank as loan servicer could owe a duty to a borrower is consistent with Missouri law.

> When a person possesses knowledge or skill superior to that of an ordinary person, the law requires of that person conduct consistent with such knowledge or skill. . . . A professional person owes a client a duty of care commensurate with the degree of care, skill and proficiency commonly exercised by ordinarily skillful, careful and prudent professionals.

*Bus. Men's Assurance Co. of Am.*, 891 S.W.2d at 453 (quotation and citation omitted). Based on this rule, the court in *Pace* "[a]ssum[ed], without deciding, that Missouri courts

would recognize a duty of care on the part of a loan servicer to a borrower." *Pace*, 2012

WL 3705088, at *16. In addition:

> Where the parties have entered into a contract, [Missouri's] common law
> has imposed the duty to perform with skill, care, and reasonable expedience
> and faithfulness in regard to the thing to be done or accomplished within
> the contract. The negligent failure to observe and perform any portion of
> that duty gives rise to an action in tort as well as an action for breach of
> contract.

*Autry Morlan Chevrolet Cadillac, Inc.*, 332 S.W.3d at 193 (quoting *Am. Mortg. Inv. Co.*,

671 S.W.2d at 293). In this case, the thing to be accomplished by the contract was the

Lonergans' repayment of their loan. The promissory note provided that the Bank would

deliver or mail to the Lonergans notice of any change in the amount of their monthly

payment. [Doc. # 5-1 at 3]. The note also stated that this notice would "include . . . the

title and telephone number of a person who will answer any question [the lender] may

have regarding the notice." [Doc. # 5-1 at 3].

The existence of a duty is a question of law decided by the Court. *Lopez v. Three*

*Rivers Elec. Coop., Inc.*, 26 S.W.3d 151, 155-56 (Mo. 2000) (en banc). In this case, the

Bank, incidental to the relationship created by the promissory note, had a duty to exercise

reasonable care in providing the Lonergans with information about the notice when they

called the number attached to the notice. The duty's origin is the combination of that

owed by a professional with superior knowledge or skill and that owed by a party to a

contract to exercise reasonable care with respect to the thing to be accomplished by the

contract. In the promissory note, the Bank held itself out as possessing superior

knowledge or skill by providing an assurance that the person reached at the number

attached to the notice could answer the Lonergans' questions about the notice, and thereby ensure proper repayment of the loan. Yet the Lonergans allege that they called this number twice, and during each call they were erroneously instructed to disregard the notice they received and continue making payments of $8,164.82. [Doc. # 35 at 12-13]. The Lonergans claim that this breached the duty the Bank had as loan servicer, incidental to the relationship created by the promissory note.

Thus, the Lonergans have alleged the existence of a duty the Bank, as loan servicer, owed them as a result of the relationship created by the execution of the mortgage contract. The parties have presented no argument regarding the other essential elements of a negligence claim and so the Court need not address them. The sole issue presented was whether a bank as loan servicer could ever owe a duty to a borrower because of the relationship created by the execution of a mortgage contract. Having found that the Lonergans plausibly alleged the existence of such a duty, the Bank's motion to dismiss the Lonergnas' negligence claim for failing to plead a cognizable duty must be denied.

### D.    Aiding and Abetting

The Bank argues that the Lonergans' claim for aiding and abetting must be dismissed because Missouri does not recognize aiding and abetting liability in the commission of a tort. In *Bradley v. Ray*, 904 S.W.2d 302, 315 (Mo. Ct. App. 1995), the Missouri Court of Appeals cited the Restatement (Second) of Torts § 876(b) as the basis for "[t]he tort of aiding and abetting." Section 876(b) provides:

> For harm resulting to a third person from the tortuous conduct of another, one is subject to liability if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.

Restatement (Second) of Torts § 876(b) (1979). After further discussing the elements of aiding and abetting, the court noted, "Plaintiff has not cited any Missouri case which recognizes a claim for aiding and abetting in the commission of a tort, and none were located through the Court's own research." *Bradley*, 904 S.W.2d at 315. Nonetheless, the *Bradley* court ultimately dismissed the plaintiff's aiding and abetting claim for failure to plead facts that would support such a claim even if aiding and abetting liability were recognized in this context. *Id.* at 315 ("Even were this cause of action recognized, however, plaintiff did not plead facts which support a claim of aiding and abetting against defendants.").

The Lonergans claim that the *Bradley* court erred because Missouri cases have recognized aiding and abetting in the commission of a tort. In *McMannus v. Lee*, 43 Mo. 206 (Mo. 1869), the Missouri Supreme Court held:

> The law is well laid down that any person who is present at the commission of a trespass, encouraging or exciting the same by words, gestures, looks, or signs, or who in any way or by any means countenances or approves the same, is in law deemed to be an aider and abettor, and liable as a principal.

*McMannus*, 43 Mo. at 208; *see also Brown v. Barr*, 171 S.W. 4, 6 (Mo. Ct. App. 1914) ("The rule is well settled that one who is present, aiding, and abetting another who commits an assault, is as much a principal as he who strikes the blow or fires the shot."). In *Knight v. W. Auto Supply Co.*, 193 S.W.2d 771 (Mo. Ct. App. 1946), the court approved the submission of an assault case to a jury based "solely upon the theory of

22

aiding and abetting." *Knight*, 193 S.W.2d at 776. In a more recent decision, *Phelps v. Bross*, 73 S.W.3d 651 (Mo. Ct. App. 2002), the Missouri Court of Appeals implicitly recognized the existence of aiding and abetting liability in the commission of a battery. In *Phelps*, the court affirmed summary judgment for the defendant on the plaintiff's battery claim because the plaintiff had "no recollection that [the defendant] in fact ever touched her in any offensive manner *or that he encouraged or aided* Church in doing so." *Phelps*, 73 S.W.3d at 656 (emphasis added). The court further noted that in all of the cases cited by the plaintiff, "evidence existed that the individual held jointly and severally liable encouraged, incited, *or* participated in the battery." *Id.* (emphasis added).

The Bank attempts to distinguish these cases on the ground that they recognized aiding and abetting only in the context of trespass, assault, or battery. But the Bank offers no principled reason why aiding and abetting would exist for these torts, but not for at least other intentional torts, like fraud and misrepresentation. Citing *Bradley*, the Bank maintains that the Lonergans' claim fails because they have not presented any case recognizing aiding and abetting in the commission of fraud, misrepresentation, or negligence. But the *Bradley* court ultimately dismissed the plaintiff's aiding and abetting claim on the merits, assuming *arguendo* that such liability existed. *Bradley*, 904 S.W.2d at 315 ("Even were this cause of action recognized, however, plaintiff did not plead facts which support a claim of aiding and abetting against defendants."). Consequently, the Bank has not shown that, as a matter of law, aiding and abetting liability does not exist for torts in Missouri. As this is the only argument the Bank makes regarding the

23

Lonergans' claim of aiding and abetting, dismissal of the Lonergans' claim on this ground is not proper.

## III.  Conclusion

For the reasons set forth above, the Bank's motion to dismiss for failure to state a claim [Docs. ## 4, 38], is DENIED.

s/ NANETTE K. LAUGHREY
NANETTE K. LAUGHREY
United States District Judge

Dated: January 16, 2013
Jefferson City, Missouri